UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GEORGE H. PAUBEL, JR.,                    )
                                          )
                    Plaintiff,            )
                                          )
            v.                            )       No.  4:10CV001 CAS
                                          )                  (TIA)
MICHAEL ASTRUE, Commissioner              )
of Social Security,                       )
                                          )
                    Defendant.            )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b).  The suit involves applications for Disability Insurance Benefits under Title II of the Social

Security Act and Supplemental Security Income under Title XVI of the Act.

**I.     Procedural History**

On February 7, 2007, Claimant filed Applications for Disability Insurance Benefits under

Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 60-67)[1] and Supplemental Security Income

payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 29-

33), alleging disability since January 1, 2005 due to "avasular necrosis, something attacking

joints." (Tr. 48-52, 116).  The applications were denied (Tr. 23-27, 48-52), and Claimant

subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on

October 14, 2008.  (Tr. 45, 523A-41).  In a decision dated November 20, 2008, the ALJ found

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer.
(Docket No. 11/filed March 19, 2010).

that Claimant had not been under a disability as defined by the Social Security Act, from January 1, 2005 through the date of the decision. (Tr. 13-21). After considering the request for review and the letter from Leslie Yoffie, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on October 31, 2009. (Tr. 3-7, 507-23). Thus, the ALJ's decision is the final decision of the Commissioner.

## II. Evidence Before the ALJ

### A. Hearing on October 14, 2008

#### 1. Claimant's Testimony

At the hearing on October 14, 2008, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 526-40). At the time of the hearing, Claimant was fifty years of age. (Tr. 526). Claimant completed high school and over one year of college. (Tr. 526). Claimant has lived with his mother since December 2004 after he could no longer work. (Tr. 536). His mother does the cooking, cleaning, yard work, and laundry. (Tr. 536).

Claimant worked from 1999 through December 2004 at American Rail Car starting as a crib attendant. (Tr. 537). His job duties included taking care of the shipping and receiving. Claimant's job required him to sit for two hours and stand for the remainder of the work day. Claimant had to lift thirty pounds as an accommodation because the job required him to lift fifty to seventy pounds. (Tr. 537-38). Claimant testified that he eventually handled all the purchasing duties. (Tr. 537). When he could no longer stand, he moved to a sedentary position where he was sitting all day and using his hands typing and writing all day. (Tr. 537-38). Claimant testified that he could no longer sit long enough to complete his job. (Tr. 537). Because Claimant had to leave his desk with great frequency, his employer reprimanded him. (Tr. 537-38). At the end of

his tenure, Claimant testified that he could not lift anything. (Tr. 538). Claimant testified that Rail Car Company asked him to leave, and he collected unemployment compensation. (Tr. 539). Claimant testified that he could not return to that position. (Tr. 538). From 1982 though 1999, Claimant testified that he worked for AMF Corporation starting as a bartender in a bowling alley. During his tenure, Claimant worked his way up the ladder being promoted to general manager and running bowling facilities for AMF Corporation. Claimant testified that his job duties included running the daily operations of the business, hiring and firing, interviewing candidates for employment, scheduling employees, overseeing the food and beverage operation, and marketing for the company. Claimant testified his job required him to sit for two hours and stand for the rest of the work day. (Tr. 538). Claimant testified that he could not return to that job. (Tr. 539). Claimant testified that he left his general manager position, because he could no longer stand on his feet for such a long period of time during the work day. (Tr. 539).

Claimant testified that his disability is severe degenerative osteoarthritis and avascular necrosis in his left femur and left hip. (Tr. 526). His problems with degenerative osteoarthritis started around 1995, two to three years after the first replacement surgery in 1993. (Tr. 526-27). In 1995 Claimant started to have severe pain in his wrists, knees and ankles. (Tr. 527). Claimant received arthritis medications as treatment. In December 2004 his conditions became so severe that he could no longer work. Claimant testified that he could not write with an ink pen for long, and he could not use the keyboard on his computer. Claimant testified that he experienced pain in almost every joint of his body. (Tr. 527).

Claimant's treating doctor is Dr. Ali, a rheumatologist. (Tr. 527-28). Claimant testified that he has taken six different arthritis medications with no relief. (Tr. 528). Next, Dr. Ali

prescribed hydrocodone for pain but the medication caused him to be drowsy and constipated without alleviating the pain. (Tr. 528). Claimant testified that he has had three procedures to his knee, one in 1972, the next in 1980, and the last in 1980. (Tr. 528-29). Claimant testified that he is waiting for knee replacement surgery as soon as he fully recovers from his hip replacement surgery in September 2008. (Tr. 529).

Claimant testified that he had a total hip replacement in 1992 performed by Dr. Leo Whiteside. (Tr. 531). After completing vocational rehabilitation after the surgery, Claimant returned to work after changing fields. In 2007, Claimant testified that the avascular necrosis became a problem. (Tr. 531). Claimant returned to Dr. Whiteside for treatment and learned that he had a hole developing above the cup in the hip bone that would require additional surgery. (Tr. 531-32). In September 2008, Claimant had a left hip repair and revision. (Tr. 532). Claimant testified that he is currently undergoing physical therapy at St. Louis University Hospital twice a week. (Tr. 532).

Claimant testified that the osteoarthritis causes extreme pain everywhere and impairs his ability to concentrate. (Tr. 529). Claimant cannot open a jar. (Tr. 529). Claimant can write his name and then the pain starts. (Tr. 530). Claimant wakes up three times during the night because the pain causes discomfort. Claimant testified that the avascular necrosis started in 1982 after he was recovering from the second knee surgery in 1980. Claimant testified that he had surgery on his hip in 1981 and then he had additional hip surgery in 1982. (Tr. 530). Claimant testified that he returned to work, but that he was unable to stay in the same field, an apprenticeship in plumbing. (Tr. 531).

Claimant testified that his hip has caused him constant pain preventing him from

concentrating.  (Tr. 532).  Claimant testified that the hip replacement caused one of his legs to become an inch or more shorter than the other leg and placing more strain on his right knee.  (Tr. 533).  After sitting for one hour, Claimant has to change positions and stand up and move around. Claimant testified that he can stand for five minutes and then his knee starts to buckle.  Claimant testified that he cannot stoop due to the limitations caused by the hip replacement.  (Tr. 533). Claimant testified that he is limited to bending at his waist no more than ninety degrees.  (Tr. 534).  Claimant testified that he cannot lift or carry anything and that the doctor has limited him in lifting or carrying more than ten pounds.  Walking causes Claimant to experience pain in his feet, knees and right hip.  Claimant testified that he cannot do steps or ladders.  (Tr. 534).  Claimant testified that he had been prescribed to use a cane around the house and walking short distances and advised if walking long distances to use a walker.  (Tr. 532).

As to his daily activities, Claimant testified that he wakes up around 5:00 a.m.  (Tr. 534). Claimant's pain prevents him from sleeping through the night.  (Tr. 535).  Because Claimant can no longer access his bedroom in the basement, and he is more comfortable, Claimant sleeps in a recliner.  (Tr. 535, 539).  Claimant has been diagnosed with sleep apnea and has a C-Pap machine. (Tr. 535). Because he does not have insurance coverage, he no longer uses the C-Pap machine. Claimant spends his day watching television and on occasion letting the dog outside.  (Tr, 535). Claimant testified that he leaves the house once a day.  (Tr. 536).  Claimant's hobbies used to include cooking and bowling.  (Tr. 537).  Claimant testified that he drives a car three times a week.  (Tr. 540).  Claimant attends AA meetings and has been sober for two years. (Tr. 540).

### 2.  Explanation of Determination

In the Explanation of Determination, the disability examiner explained the denial of

benefits as follows:

> Claimant is capable of performing sedentary work, This would prevent him from returning to his Light to Medium PRW.  Using Med-Voc Rule 201.21, claimant would be capable of performing other work such as surveillance system monitor (government service) 379.367-010; call-out operator (retail trade) 237.367-014; and weight tester (paper and pulp) (recycling) 539.485-010.  Therefore, a denial is recommended.

(Tr. 35).

### 3.  Forms Completed by Claimant

In the Disability Report - Appeal, Claimant reported having "trouble standing or walking I can't carry or lift anything.  I can't do steps, only straight level."  (Tr. 82).

In the Disability Report - Adult, the interviewer noted that Claimant reported he stopped working on December 31, 2004 after being fired for not being able to perform the job any longer.  (Tr. 116).  Claimant indicated that he could lift and carry fifty pounds.  (Tr. 116).

## III.  Medical Records

On March 15, 2007, Claimant received treatment at the St. Louis County Department of Health - John C Murphy Health Center complaining of severe arthritic symptoms and pain in his hands.  (Tr. 173-76, 339-43, 351-55, 372-376).  Claimant reported smoking one package of cigarettes each day.  (Tr. 173, 339, 351, 372).  Examination revealed a decreased range of motion and painful movements in the bilateral wrists and a limited range of motion bilaterally.  (Tr. 175, 341, 353, 374).  Dr. Patricia Inman noted that Claimant was unable to lift arms above ninety degrees abduction.  Dr. Inman diagnosed Claimant with osteoarthritis generalized involving hand and multiple sites and avascular necrosis of left femoral head with hip replacement, and benign essential hypertension.  Dr. Inman referred Claimant for treatment of his obstructive chronic

bronchitis.  (Tr. 175, 341, 353).

In a follow-up visit on March 29, 2007, Claimant returned reporting joint pain and requesting blood pressure medications.  (Tr. 170, 336, 348, 358).  Claimant reported carpal tunnel syndrome occurring in persistent left hand described as moderate.  Claimant reported medication side effect from blood pressure medicine.  (Tr. 170, 336, 348, 358).  Examination showed passive range of motion in the shoulder and limited internal and external rotation.  (Tr. 172, 338, 350, 360).  Examination showed decreased range of motion in bilateral wrists with movements painful.  Dr. Inman diagnosed Claimant with carpal tunnel syndrome and generalized osteoarthritis and prescribed a thyroid medication for his carpal tunnel syndrome and medication for arthritis.  (Tr. 172, 338, 350, 360).

On April 6, 2007, Dr. Fedwa Khalifa evaluated Claimant on referral of the state agency.  (Tr. 418-20).  Dr. Khalifa noted that Claimant last worked in December 2004 performing an office job, and his chief complaints to be avascular necrosis of the left hip and something attacking his joints. (Tr. 418).  Examination demonstrated limitation of left hip abduction and tenderness, limitation of both shoulder movements, and all other joint movements to be within normal range.  (Tr. 419).  Dr. Khalifa noted that Claimant walks with a limp favoring his right leg; he can walk on his toes with pain; and he can walk on his heels with no difficulty.  In the clinical impression, Dr. Khalifa noted that Claimant has tenderness with decrease abduction of his left hip and restriction of shoulder movement but all other joint movements to be within normal range.  (Tr. 419).

In the Physical Residual Functional Capacity Assessment completed on April 9, 2007, J. Moses, a medical consultant, listed total hip replacement in 1992 secondary to avascular necrosis

as Claimant's primary diagnosis. (Tr. 427). The medical consultant indicated that Claimant can occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and unlimited in pushing and pulling except as otherwise noted for lifting/carrying. (Tr. 426). As the evidence in support, the consultant noted how the consultative evaluator in March 2007 noted Claimant to have limitation of left hip abduction and tenderness, limitation of both shoulder movements, and otherwise all joint movements to be normal. (Tr. 426). Examiner noted Claimant to walk with a limp favoring his right leg, to walk on his toes with pain, to walk on his heels with no difficulty, and has 5/5 muscle strength in all extremities. (Tr. 425). Claimant reported being able to walk less than one block, to stand for fifteen minutes, to go up a flight of stairs, cannot squat or bend knees, can carry a cup of coffee, and can button his clothes. The consultant noted that Claimant worked after his 1992 total hip replacement surgery until January 2005 when he was terminated for not being able to do his job. (Tr. 425). With respect to postural limitations, the consultant found Claimant never can balance and can occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 428). With respect to manipulative, visual, communicative, and environmental limitations, the consultant indicated that Claimant had none established. (Tr. 428-29). The consultant found Claimant has a medically determined impairment "which would reasonably cause limitations with extended walking and standing." (Tr. 430). The consultant noted that Claimant did not mention during the consultative examination any alleged limitations due to his hands. The consultant found Claimant's alleged limitations to be partially credible. (Tr. 430).

Claimant returned to the Murphy Health Center on April 18, 2007 and reported having blurred vision. (Tr. 167). Claimant reported smoking one package of cigarettes a day. Claimant

rated his pain at a level four out of ten. (Tr. 167). The treating doctor diagnosed Claimant with astigmatism and chalazion and directed Claimant to apply warm, moist compresses and gave a prescription for glasses. (Tr. 168-69).

In a follow-up visit on April 30, 2007, Claimant reported having joint pain and being concerned about his blood pressure. (Tr. 164, 334, 436). Dr. Inman prescribed medication for hypertension although noting that Claimant refuses to take blood pressure medications and continued medication for arthritis. (Tr. 165, 346).

Claimant returned on July 2, 2007 to the Murphy Health Center complaining of joint pain and reporting hip replacement surgery at the end of the week. (Tr. 161). Dr. Inman diagnosed Claimant with benign essential hypertension, osteoarthritis involving his hand, and avascular necrosis of femoral head and cleared Claimant for surgery. (Tr. 162). Dr. Inman advised Claimant to stop smoking. (Tr. 163).

On July 6, 2007, Dr. Brent Matthews performed laparscopic bilateral hernia repairs with mesh and umbilical hernia repair at Barnes Jewish Hospital. (Tr. 413-17).

On July 31, 2007, Claimant returned to the Murphy Health Center and reported having pain and difficulty with joints. (Tr. 156, 409). Claimant reported taking medications for hypertension without difficulty. Claimant reported smoking one package of cigarettes each day. (Tr. 156, 409). Claimant rated his pain at a level five out of ten. (Tr. 157, 410). Examination showed decreased range of motion with painful movements of the bilateral shoulder, wrist and knee. (Tr. 158, 411). Dr. Inman referred Claimant to St. Louis Connect Care Orthopedics and prescribed Vicodin. (Tr. 158, 411).

On August 10, 2007, Claimant visited St. Louis Connect Care on referral by Dr. Inman

and reported severe bone and joint pain.  (Tr. 230, 237, 295).  Claimant reported that he stopped working three years earlier because he was laid off.  (Tr. 231, 296).  Dr. Zarmeena Ali prescribed pain medication, Tylenol #3, as needed and directed Claimant to complete his range of motion exercises every day.  (Tr. 233, 235, 258, 298).  The doctor assessed Claimant with osteoarthritis.  (Tr. 298).  The x-ray of Claimant's right and left hands showed minimal degenerative joint disease.  (Tr. 299-300).

On August 28, 2007, Claimant returned to the Murphy Health Center complaining of arthritis and rating his pain at a level five.  (Tr. 151).  Dr. Inman noted that Claimant's pain to be well controlled on medication.  (Tr. 151).  Dr. Inman prescribed Relafen and noted follow-up appointments with orthopedist and rheumatologist.  (Tr. 152).

On September 18, 2007, Claimant called the Murphy Health Center requesting refill of pain medication.  (Tr. 150).  Dr. Inman agreed to refill his pain medication.  (Tr. 150).

On October 5, 2007, Claimant returned to St. Louis Connect Care complaining of pain all over his body at the level of ten.  (Tr. 288).  Claimant reported Vicodin to be the only medication that has helped alleviate his pain.  (Tr. 288).  Dr. Ali noted he was unable to examine Claimant fully due to Claimant's complaints of pain on touching.  (Tr. 289).  Dr. Ali assessed Claimant to have osteoarthritis and determined Claimant to be severely deconditioned with the need to increase daily activities.  Dr. Ali recommended acquatherapy and Claimant take daily calcium and vitamin D.  Dr. Ali prescribed Vicodin for pain.  (Tr. 289).

On December 14, 2007, Claimant returned to the Murphy Health Center complaining of hypertension.  (Tr. 146).  Dr. Inman noted that Claimant reported taking medications without difficulty starting on July 31, 2007.  Claimant reported feeling well with minor complaints of pain

in joints and taking medications without any side effects. Claimant reported smoking one package of cigarettes a day. (Tr. 146). Examination showed a full range of motion in all joints. (Tr. 148). Dr. Inman diagnosed Claimant with hypertension and osteoarthritis and noted Claimant's arthritis to be managed by rheumatology. (Tr. 148). Claimant called on December 17, 2007 requesting updated rheumatology clinic referral, and the nurse noted that she located a referral for six visits last summer. (Tr. 145, 227).

Claimant received treatment at St. Louis Connect Care on December 14, 2007 for his joint pain and severe pain in his right wrist. (Tr. 225, 280). Claimant reported working three years later but then being laid off. (Tr. 225, 280). Dr. Ali prescribed medication and instructed Claimant to return for follow-up treatment. (Tr. 226, 281). Dr. Ali gave Claimant a 10mg depomedrol wiht 0.5 lidocaine injection. (Tr. 282). In a return visit on December 31, 2007, Claimant reported severe pain in his left hip and right knee. (Tr. 221). The x-rays showed moderate degenerative joint disease in the right knee. (Tr. 221, 276). Claimant reported Vicodin as helping. (Tr. 221). The x-ray of Claimant's left knee showed no significant arthritic change. (Tr. 275). The x-ray of his right knee showed moderate degenerative joint disease. (Tr. 276). The x-rays of Claimant's hips showed status post hip arthroplasty changes and the right hip to be within normal limits. (Tr. 277).

On January 17, 2008, Claimant reported pain all over his body and the prior injection not working to alleviate his pain. (Tr. 220, 269-70). Claimant reported that Vicodin provides him considerable relief. (Tr. 216). Claimant reported being able to walk daily and has been trying to get into acquatherapy class at the Florisant civic center. (Tr. 216, 270). Dr. Ali observed Claimant to have an abnormal gait and limping on the left. (Tr. 217, 272). Dr. Ali continued the

Vicodin prescription and directed Claimant to exercise daily to improve tolerance and to return in one month. (Tr. 217, 219).

On February 11, 2008, Dr. Brian Fissel, a physician in the Department of Orthopedic Surgery at St. John's Mercy Medical Center, evaluated and examined Claimant for treatment of status post left total hip arthroplasty with pain and right knee pain on referral from the Connect Care Clinic. (Tr. 431-33). Claimant reported pain in the left hip for the past four years and total hip arthroplasty performed by Dr. Whiteside with no complications at the time of surgery. (Tr. 431). Claimant walks with a limp and rated his level of pain as a four. Claimant reported not using any supportive devices. Claimant reported being able to walk around the block, and sitting not causing him problems. Claimant rated his knee pain at the level of a ten. (Tr. 431). Examination showed a full range of motion of the right hip and a limited range of motion of the left hip. (Tr. 432). Examination of the right knee showed slight flexion contracture and some positive tenderness to palpation along the medial joint line and some along lateral joint line. Dr. Fissel included in his impression failed left total arthroplasty with osteolysis surrounding the acetabular cup and severe osteoarthritis of the right knee. Dr. Fissel determined that in order to better assess Claimant's hip, he would need to obtain a CAT scan of his pelvis and proximal femur. Dr. Fissel found that Claimant would be a candidate for total knee arthroplsty on the right side, and this should be done after Claimant's left hip has been resolved. Dr. Thomas Otto indicated that he was present during the physical examination and discussed the findings of the physical examination with the resident and agreed with the impression and plan of treatment. (Tr. 432). The x-rays revealed a total hip arthoplasty on the left side with a large cavitary lesion in the superior region above the acetabulurn, some slight eccentric polyethylene wear, overall the cup to

be well fixed and in good position, and femoral component to be well fixed with no obvious cavitary lesions and/or large areas of asteolysis. The x-ray of his knees revealed severe osteoarthritic changes, complete loss of joint space on the medial side with some osteoarthritic formation as well as sclerosis of both joint surfaces and osteophytes present laterally and on the patellofemoral joint. (Tr. 433).

In a follow-up visit on April 23, 2008 at the Murphy Health Center, Claimant requested a referral to rheumatology. (Tr. 139, 394). Claimant returned for an annual physical and surgical clearance for left hip replacement by Dr. Otto at St. John's. Other than severe arthritic pain, Claimant reported doing well and blood pressure being well controlled. (Tr. 139, 394). Examination showed a full range of motion of all joints. (Tr. 141 396).

On April 30, 2008, Claimant received treatment at Murphy Health Center for hypertension noted to be well controlled, tobacco use disorder, and hyperlipidemia. (Tr. 138, 393). The ARPN noted that Claimant would be referred for smoking cessation treatment. (Tr. 138, 393).

In a follow-up visit on May 9, 2008 at St. Louis Connect Care, Claimant reported pain all over his body at a level ten. (Tr. 209, 263, 265). The doctor noted that Claimant was last treated on January 17, 2008 for tendinitis and taking Vicodin for pain relief. (Tr. 210). The doctor noted that Claimant has difficulty walking due to pain and limping on the right side due to foot pain. (Tr. 211-12, 266-67). Claimant reported continued tobacco use. (Tr. 265). The doctor found Claimant to have osteoarthritis and determined to treat on current therapy with Vicodin and injections. (Tr. 212).

On May 27, 2008, Claimant returned to St. Louis Connect Care for evaluation and treatment. (Tr. 259). Claimant reported pain at a level four, chest pain, and shortness of breath.

(Tr. 259-61).  The doctor recommended a stress test.  (Tr. 261).

On September 4, 2008, Claimant returned to Dr. Otto's office for a preoperative evaluation.  (Tr. 434).  The x-ray of Claimant's pelvis showed a left total hip arthroplasty with obvious hardware failure, and significant evidence of osteolysis in the dome and posterior wall posterior column region of the acetabulum.  (Tr. 435).  In the radiographic impression, the doctor noted periacetabular osteolysis with no conclusive evidence of loose implants following a remote left total hip arthroplasty.  (Tr. 435).  Claimant reported taking three Vicodin each day and on most days, being able to walk his dog around the block but sometimes not being able to do so because of pain.  (Tr. 457).  In the impression, Dr. Otto noted how Claimant is scheduled to undergo revision left total hip arthroplasty.  Dr. Otto observed Claimant to have a mildly antalgic gait favoring his left side.  (Tr. 457).

On September 17, 2008, Dr. Otto performed revision arthroplasty of the left hip with bone graft.  (Tr. 436-56, 459-506).  Claimant's preoperative diagnosis included failed left total hip arthroplasty and the operative procedure to be revision arthroplasty of left hip, both components, with injectable bone graft substitute periacetabular.  (Tr. 487).  In the clinical history, Dr. Otto noted that Claimant had a total hip replacement in 1994, and he did well until several years earlier when he started to have increasing osteolsis involving the periacetabular bone in the left hemipelvis.  (Tr. 487).  After the surgery, Dr. Otto recommended that Claimant continue physical therapy.  (Tr. 464).

IV.    The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date.  (Tr. 18).  Claimant last met the insured status requirements of the

Social Security Act on December 31, 2009.  The ALJ found that the medical evidence establishes

that Claimant has osteoarthritis ,but no impairment or combination of impairments listed in, or

medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 18).  Also, the

ALJ noted that Claimant received unemployment benefits, which required him averring that he

was ready and able to work and was actively seeking employment.  (Tr. 21).  The ALJ found that

Claimant has the residual functional capacity to perform a full range of sedentary work.  (Tr. 18).

The ALJ determined that Claimant is able to perform past relevant work as a purchasing agent

and such work does not require the performance of work-related activities precluded by his

residual functional capacity.  (Tr. 21).  In assessing Claimant's RFC, the ALJ evaluated his

credibility.  (Tr. 19-21).  The ALJ found that Claimant was not under a disability from January 1,

2005, the alleged onset date, through the date of his decision.  (Tr. 21).

## V.     Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The claimant's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the claimant's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to properly formulate his residual functional capacity by failing to make specific findings regarding his limitations with lifting, carrying, pushing, pulling, sitting, standing, and walking. Claimant also contends that the ALJ failed to consider evidence that he requires additional surgery.

A.    Residual Functional Capacity

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the ALJ properly assessed the medical evidence and Claimant's credibility. "The ALJ must determine

a claimant's RFC based on all of the relevant evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the Claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). "The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004); see also 20 C.F.R. § 404.1545(a) ("We will assess your resid ual functional capacity based on all the relevant evidence in your case record."). It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC. Pearsall, 274 F.3d at 1218. The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and Claimant's own descriptions of his limitations. Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an

administrative determination reserved to the Commissioner. 20 C.F.R. §§ 416.927(e)(2), 416.946.

The ALJ "may not draw upon his own inferences from medical reports." Lund v Weinberger, 520 F.2d 782, 785 (8th Cir. 1975). "If the ALJ did not believe, moreover, that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [the claimant's] mental impairments limited his ability to engage in work-related activities. Lauer, 245 F.3d at 706 (citing Nevland, 204 F.3d at 858; 20 C.F.R. § 404.1519a(b)).

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required

to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record.").

The ALJ's determination of Claimant's RFC is supported by substantial evidence in the record. Likewise, the ALJ noted several inconsistencies within the record, and he pointed out the lack of supporting objective medical evidence. The ALJ opined that the medical record does not show that any physician imposed any functional restrictions of Claimant or found him to be totally disabled. Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant. The ALJ also properly considered the Polaski factors in concluding that Claimant's subjective complaints of pain and discomfort in his hands are not supported by the objective medical evidence inasmuch as the x-rays of his hands in June 2007 showed only minimal degenerative changes. The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform sedentary work. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case). Those included Claimant's

testimony at the hearing, the statements in the Adult Disability - Report, the absence of objective medical evidence of deterioration, the absence of any doctor finding Claimant disabled or unable to seek employment, and his receipt of unemployment benefits. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform sedentary work. Indeed, although Claimant testified that at the hearing he could not lift anything, Claimant indicated in the Disability Report - Adult that he could lift and carry fifty pounds. (Tr. 116, 538). The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform sedentary work. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant has the residual functional capacity to perform sedentary work. The ALJ thus concluded that Claimant could meet the demands of sedentary work.

During an office visit on February 11, 2008, Claimant reported not using any supportive devices. The ALJ noted that in the treatment note that Dr. Otto noted Claimant to walk with a limp but without the use of a cane. Nonetheless, at the hearing, Claimant testified that he had been prescribed a cane to use around the house and walking short distances and advised if walking long distances to use a walker. (Tr. 532). The record before the undersigned contains no objective medical evidence substantiating Claimant's need to use a cane. Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility). Likewise, no doctor determined Claimant needed to use a

cane as a medical necessity.  See, e.g., Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004)

(whether there is a need to lie down is a medical question requiring medical evidence; record did

not contain any evidence that medical condition required claimant to lie down for hours each day).

Indeed, a review of the doctors' treatment notes show that none of the doctors ever prescribed a

cane for Claimant's use.  Thus, if Claimant was using a cane not out of medical necessity, he must

be doing so out of choice.  See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf.

Harris v. Barnhart, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a

medical question requiring medical evidence; record did not contain any evidence that medical

condition required claimant to lie down for hours each day).  These observations are supported by

substantial evidence on the record as a whole.

Further, the undersigned notes that Claimant continued to smoke cigarettes, despite the

fact that he claimed to suffer from sleep apnea, shortness of breath and chest pain, and despite the

fact that he was repeatedly advised by doctors to stop.  The fact that a claimant fails to quit

smoking is a factor detracting from credibility.  Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir.

1997).

Finally, Claimant testified that he received unemployment benefits after his alleged

disability onset date.  A claimant who applies for unemployment compensation benefits holds

herself out as available, willing, and able to work.  Because such application necessarily indicates

an ability to work, it is evidence which negates Claimant's claim that he was disabled.  See Black

v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998); Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir.

1991); see also Salts v. Sullivan, 958 F.2d 840, 846 n. 8 (8th Cir. 1992) ("[I]t is facially

inconsistent for [a claimant] to accept unemployment compensation while applying for social

security benefits."). Claimant's contention that the ALJ made improper inferences from his unemployment claim is without merit. The record shows that Claimant stopped working on December 31, 2004 and filed for disability alleging on onset date of January 1, 2005. See Disability Report - Adult (Tr. 116). Indeed at the hearing Claimant testified that after leaving his employment at Rail Car Company, he collected unemployment compensation. (Tr. 539). Receipt of unemployment benefits after the Claimant stopped working is a fact inconsistent with an inability to work.

The substantial evidence on the record as a whole supports the ALJ's decision. Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

Claimant's contention that the ALJ's RFC is deficient, because the ALJ failed to make specific findings regarding his limitations with lifting, carrying, pushing, pulling, sitting, standing, and walking is without merit. Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary is carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a). As noted above, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009)(quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)). The medical records do not include any restrictions placed by any physician on

Claimant's ability to lift and carry, push and pull, sit, stand, and walk. Indeed, except for Claimant's testimony at the hearing regarding severe limitations, no other evidence supports such limitations. Indeed, in the Physical Residual Functional Capacity Assessment, a medical consultant determined that Claimant can occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and to be unlimited in pushing and pulling except as otherwise noted for lifting/carrying. In January 2008, Claimant reported to Dr. Ali that he has been able to walk daily. In February 2008,Claimant reported to Dr. Otto that he can walk around the block and sitting does not cause him problems. In September 2008, Claimant reported taking three Vicodin each day and on most days, being able to walk his dog around the block but sometimes not being able to do so because of pain. The ALJ's failure to include in the RFC limitation any specific findings regarding his alleged limitations with lifting, carrying, pushing, pulling, sitting, standing, and walking is within the "available zone of choice." See Owen, 551 F.3d at 798.

Claimant's contention that the ALJ should have factored into his RFC determination his need for future surgery is without merit. The undersigned notes that the fact that Claimant did not allege the need for knee replacement surgery in his application for disability benefits is significant. See, e.g. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (failure to allege disabling mental impairment in application is significant, even if evidence of depression was later developed); Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993). "[A]n ALJ is not obligated 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)). Indeed, Claimant testified at the

hearing that he was awaiting knee replacement surgery but no testimony was adduced that his knee condition would deteriorate after surgery or how the surgery would impair Claimant's ability to function in a work like setting. The undersigned does not believe that Claimant's future knee replacement surgery constitutes substantial evidence of what Claimant was able to at the time the ALJ rendered his decision.

In sum, a review of the record convinces the undersigned that the ALJ's decision was "within the available zone of choice" and should not be disturbed. See, e.g., Heino v. Astrue, 578 F.3d 873, 880 (8th Cir. 2009) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).


For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this   2nd   day of March, 2011.