# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE H. PAUBEL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10-CV-1 CAS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court pursuant to the Report and Recommendation of United States Magistrate Judge Terry I. Adelman, filed March 2, 2011. See 28 U.S.C. § 636(b). The Magistrate Judge recommended that the decision of the Commissioner denying plaintiff George H. Paulbel, Jr.'s ("Claimant") applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") benefits under Title XVI of the Act be affirmed. The Magistrate Judge found there was substantial evidence to support the Administrative Law Judge's ("ALJ") decision denying Claimant's claim for benefits and recommended that the decision be affirmed.

Claimant has filed objections to the recommendation, asserting that the ALJ's decision was legally erroneous and not supported by substantial evidence because the ALJ (1) failed to make specific findings on Claimant's Residual Functional Capacity ("RFC") regarding his limitations with lifting, carrying, pushing, pulling, standing and walking, and failed to follow the regulations regarding the formulation of the RFC; (2) improperly relied on certain statements about Claimant's sitting and walking ability that were taken out of context and failed to account for other evidence

in the record that provide a proper context for the statements, and thus failed in his duty to fully develop the record; (3) failed to consider Claimant's need for further surgery when assessing Claimant's limitations and knee impairments; and (4) did not properly analyze Claimant's credibility regarding subjective complaints because he did not sufficiently account for side effects from medications as required by the regulations.

For the following reasons, the Court declines to adopt the recommendation of United States Magistrate Judge, and will remand this matter to the Commission for a new hearing on Claimant's request for disability benefits and SSI.

**Legal Standard of Review**

Title 42, United States Code, Section 405(g) states that the Commissioner's final determination not to award disability insurance benefits following an administrative hearing is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) authorizes the Court to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Id.

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005) (cited case omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. Id. (cited case omitted). In addition, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by

substantial evidence.'" Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989)).

In determining whether the ALJ's decision meets the substantial evidence standard, the Court considers "all of the evidence that was before the ALJ, but [does] not re-weigh the evidence." Vester, 416 F.3d at 889 (cited case omitted). The Court must consider not only the evidence that supports the ALJ's decision, but also the evidence that detracts from the decision. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." Id. (cited case omitted).

**Procedural Background**

The Court adopts the procedural background of this case as set forth by the Magistrate Judge in the Report and Recommendation:

> On February 7, 2007, Claimant filed Applications for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 60-67)[1] and Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 29-33), alleging disability since January 1, 2005 due to "avasular necrosis, something attacking joints." (Tr. 48-52, 116). The applications were denied (Tr. 23-27, 48-52), and Claimant subsequently requested a hearing before an Administrative Law Judge (ALJ), which was held on October 14, 2008. (Tr. 45, 523A-41). In a decision dated November 20, 2008, the ALJ found that Claimant had not been under a disability as defined by the Social Security Act, from January 1, 2005 through the date of the decision. (Tr. 13-21). After considering the request for review and the letter from Leslie Yoffie, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on October 31, 2009. (Tr. 3-7, 507-23). Thus, the ALJ's decision is the final decision of the Commissioner.

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer. (Docket No. 11/filed March 19, 2010).

## II. Evidence Before the ALJ
### A. Hearing on October 14, 2008
#### 1. Claimant's Testimony

At the hearing on October 14, 2008, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 526-40). At the time of the hearing, Claimant was fifty years of age. (Tr. 526). Claimant completed high school and over one year of college. (Tr. 526). Claimant has lived with his mother since December 2004 after he could no longer work. (Tr. 536). His mother does the cooking, cleaning, yard work, and laundry. (Tr. 536).

Claimant worked from 1999 through December 2004 at American Rail Car starting as a crib attendant. (Tr. 537). His job duties included taking care of the shipping and receiving. Claimant's job required him to sit for two hours and stand for the remainder of the work day. Claimant had to lift thirty pounds as an accommodation because the job required him to lift fifty to seventy pounds. (Tr. 537-38). Claimant testified that he eventually handled all the purchasing duties. (Tr. 537). When he could no longer stand, he moved to a sedentary position where he was sitting all day and using his hands typing and writing all day. (Tr. 537-38). Claimant testified that he could no longer sit long enough to complete his job. (Tr. 537). Because Claimant had to leave his desk with great frequency, his employer reprimanded him. (Tr. 537-38). At the end of his tenure, Claimant testified that he could not lift anything. (Tr. 538). Claimant testified that Rail Car Company asked him to leave, and he collected unemployment compensation. (Tr. 539). Claimant testified that he could not return to that position. (Tr. 538). From 1982 though 1999, Claimant testified that he worked for AMF Corporation starting as a bartender in a bowling alley. During his tenure, Claimant worked his way up the ladder being promoted to general manager and running bowling facilities for AMF Corporation. Claimant testified that his job duties included running the daily operations of the business, hiring and firing, interviewing candidates for employment, scheduling employees, overseeing the food and beverage operation, and marketing for the company. Claimant testified his job required him to sit for two hours and stand for the rest of the work day. (Tr. 538). Claimant testified that he could not return to that job. (Tr. 539). Claimant testified that he left his general manager position, because he could no longer stand on his feet for such a long period of time during the work day. (Tr. 539).

Claimant testified that his disability is severe degenerative osteoarthritis and avascular necrosis in his left femur and left hip. (Tr. 526). His problems with degenerative osteoarthritis started around 1995, two to three years after the first replacement surgery in 1993. (Tr. 526-27). In 1995 Claimant started to have severe pain in his wrists, knees and ankles. (Tr. 527). Claimant received arthritis medications as treatment. In December 2004 his conditions became so severe that he could no longer work. Claimant testified that he could not write with an ink pen

for long, and he could not use the keyboard on his computer. Claimant testified that he experienced pain in almost every joint of his body. (Tr. 527).

Claimant's treating doctor is Dr. Ali, a rheumatologist. (Tr. 527-28). Claimant testified that he has taken six different arthritis medications with no relief. (Tr. 528). Next, Dr. Ali prescribed hydrocodone for pain but the medication caused him to be drowsy and constipated without alleviating the pain. (Tr. 528). Claimant testified that he has had three procedures to his knee, one in 1972, the next in 1980, and the last in 1980. (Tr. 528-29). Claimant testified that he is waiting for knee replacement surgery as soon as he fully recovers from his hip replacement surgery in September 2008. (Tr. 529).

Claimant testified that he had a total hip replacement in 1992 performed by Dr. Leo Whiteside. (Tr. 531). After completing vocational rehabilitation after the surgery, Claimant returned to work after changing fields. In 2007, Claimant testified that the avascular necrosis became a problem. (Tr. 531). Claimant returned to Dr. Whiteside for treatment and learned that he had a hole developing above the cup in the hip bone that would require additional surgery. (Tr. 531-32). In September 2008, Claimant had a left hip repair and revision. (Tr. 532). Claimant testified that he is currently undergoing physical therapy at St. Louis University Hospital twice a week. (Tr. 532).

Claimant testified that the osteoarthritis causes extreme pain everywhere and impairs his ability to concentrate. (Tr. 529). Claimant cannot open a jar. (Tr. 529). Claimant can write his name and then the pain starts. (Tr. 530). Claimant wakes up three times during the night because the pain causes discomfort. Claimant testified that the avascular necrosis started in 1982 after he was recovering from the second knee surgery in 1980. Claimant testified that he had surgery on his hip in 1981 and then he had additional hip surgery in 1982. (Tr. 530). Claimant testified that he returned to work, but that he was unable to stay in the same field, an apprenticeship in plumbing. (Tr. 531).

Claimant testified that his hip has caused him constant pain preventing him from concentrating. (Tr. 532). Claimant testified that the hip replacement caused one of his legs to become an inch or more shorter than the other leg and placing more strain on his right knee. (Tr. 533). After sitting for one hour, Claimant has to change positions and stand up and move around. Claimant testified that he can stand for five minutes and then his knee starts to buckle. Claimant testified that he cannot stoop due to the limitations caused by the hip replacement. (Tr. 533). Claimant testified that he is limited to bending at his waist no more than ninety degrees. (Tr. 534). Claimant testified that he cannot lift or carry anything and that the doctor has limited him in lifting or carrying more than ten pounds. Walking causes Claimant to experience pain in his feet, knees and right hip. Claimant testified that he cannot do steps or ladders. (Tr. 534). Claimant testified that he had been prescribed to use a

cane around the house and walking short distances and advised if walking long distances to use a walker. (Tr. 532).

As to his daily activities, Claimant testified that he wakes up around 5:00 a.m. (Tr. 534). Claimant's pain prevents him from sleeping through the night. (Tr. 535). Because Claimant can no longer access his bedroom in the basement, and he is more comfortable, Claimant sleeps in a recliner. (Tr. 535, 539). Claimant has been diagnosed with sleep apnea and has a C-Pap machine. (Tr. 535). Because he does not have insurance coverage, he no longer uses the C-Pap machine. Claimant spends his day watching television and on occasion letting the dog outside. (Tr, 535). Claimant testified that he leaves the house once a day. (Tr. 536). Claimant's hobbies used to include cooking and bowling. (Tr. 537). Claimant testified that he drives a car three times a week. (Tr. 540). Claimant attends AA meetings and has been sober for two years. (Tr. 540).

## 2. Explanation of Determination

In the Explanation of Determination, the disability examiner explained the denial of benefits as follows:

> Claimant is capable of performing sedentary work, This would prevent him from returning to his Light to Medium PRW. Using Med-Voc Rule 201.21, claimant would be capable of performing other work such as surveillance system monitor (government service) 379.367-010; call-out operator (retail trade) 237.367-014; and weight tester (paper and pulp) (recycling) 539.485-010. Therefore, a denial is recommended.

(Tr. 35).

## 3. Forms Completed by Claimant

In the Disability Report - Appeal, Claimant reported having "trouble standing or walking I can't carry or lift anything. I can't do steps, only straight level." (Tr. 82).

In the Disability Report - Adult, the interviewer noted that Claimant reported he stopped working on December 31, 2004 after being fired for not being able to perform the job any longer. (Tr. 116). Claimant indicated that he could lift and carry fifty pounds. (Tr. 116).[2]

---

[2]The Court questions whether the statement in the Disability Report -Adult that Claimant could lift 50 pounds could be a typographical error, perhaps intended to have been 5 pounds, as

### III.    Medical Records

On March 15, 2007, Claimant received treatment at the St. Louis County Department of Health - John C Murphy Health Center complaining of severe arthritic symptoms and pain in his hands. (Tr. 173-76, 339-43, 351-55, 372-376). Claimant reported smoking one package of cigarettes each day. (Tr. 173, 339, 351, 372). Examination revealed a decreased range of motion and painful movements in the bilateral wrists and a limited range of motion bilaterally. (Tr. 175, 341, 353, 374). Dr. Patricia Inman noted that Claimant was unable to lift arms above ninety degrees abduction. Dr. Inman diagnosed Claimant with osteoarthritis generalized involving hand and multiple sites and avascular necrosis of left femoral head with hip replacement, and benign essential hypertension. Dr. Inman referred Claimant for treatment of his obstructive chronic bronchitis. (Tr. 175, 341, 353).

In a follow-up visit on March 29, 2007, Claimant returned reporting joint pain and requesting blood pressure medications. (Tr. 170, 336, 348, 358). Claimant reported carpal tunnel syndrome occurring in persistent left hand described as moderate. Claimant reported medication side effect from blood pressure medicine. (Tr. 170, 336, 348, 358). Examination showed passive range of motion in the shoulder and limited internal and external rotation. (Tr. 172, 338, 350, 360). Examination showed decreased range of motion in bilateral wrists with movements painful. Dr. Inman diagnosed Claimant with carpal tunnel syndrome and generalized osteoarthritis and prescribed a thyroid medication for his carpal tunnel syndrome and medication for arthritis. (Tr. 172, 338, 350, 360).

On April 6, 2007, Dr. Fedwa Khalifa evaluated Claimant on referral of the state agency. (Tr. 418-20). Dr. Khalifa noted that Claimant last worked in December 2004 performing an office job, and his chief complaints to be avascular necrosis of the left hip and something attacking his joints. (Tr. 418). Examination demonstrated limitation of left hip abduction and tenderness, limitation of both shoulder movements, and all other joint movements to be within normal range. (Tr. 419). Dr. Khalifa noted that Claimant walks with a limp favoring his right leg; he can walk on his toes with pain; and he can walk on his heels with no difficulty. In the clinical impression, Dr. Khalifa noted that Claimant has tenderness with decrease abduction of his left hip and restriction of shoulder movement but all other joint movements to be within normal range. (Tr. 419).

---

every other statement by claimant concerning his ability to lift is that he could lift only a few pounds, or could not lift at all. Further, in the Physical Residual Functional Capacity Assessment, the medical consultant found that claimant can occasionally lift 10 pounds and can frequently lift less than 10 pounds. Tr. 426.

In the Physical Residual Functional Capacity Assessment completed on April 9, 2007, J. Moses, a medical consultant, listed total hip replacement in 1992 secondary to avascular necrosis as Claimant's primary diagnosis. (Tr. 427). The medical consultant indicated that Claimant can occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and unlimited in pushing and pulling except as otherwise noted for lifting/carrying. (Tr. 426). As the evidence in support, the consultant noted how the consultative evaluator in March 2007 noted Claimant to have limitation of left hip abduction and tenderness, limitation of both shoulder movements, and otherwise all joint movements to be normal. (Tr. 426). Examiner noted Claimant to walk with a limp favoring his right leg, to walk on his toes with pain, to walk on his heels with no difficulty, and has 5/5 muscle strength in all extremities. (Tr. 425). Claimant reported being able to walk less than one block, to stand for fifteen minutes, to go up a flight of stairs, cannot squat or bend knees, can carry a cup of coffee, and can button his clothes. The consultant noted that Claimant worked after his 1992 total hip replacement surgery until January 2005 when he was terminated for not being able to do his job. (Tr. 425). With respect to postural limitations, the consultant found Claimant never can balance and can occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 428). With respect to manipulative, visual, communicative, and environmental limitations, the consultant indicated that Claimant had none established. (Tr. 428-29). The consultant found Claimant has a medically determined impairment "which would reasonably cause limitations with extended walking and standing." (Tr. 430). The consultant noted that Claimant did not mention during the consultative examination any alleged limitations due to his hands. The consultant found Claimant's alleged limitations to be partially credible. (Tr. 430).

Claimant returned to the Murphy Health Center on April 18, 2007 and reported having blurred vision. (Tr. 167). Claimant reported smoking one package of cigarettes a day. Claimant rated his pain at a level four out of ten. (Tr. 167). The treating doctor diagnosed Claimant with astigmatism and chalazion and directed Claimant to apply warm, moist compresses and gave a prescription for glasses. (Tr. 168-69).

In a follow-up visit on April 30, 2007, Claimant reported having joint pain and being concerned about his blood pressure. (Tr. 164, 334, 436). Dr. Inman prescribed medication for hypertension although noting that Claimant refuses to take blood pressure medications and continued medication for arthritis. (Tr. 165, 346).

Claimant returned on July 2, 2007 to the Murphy Health Center complaining of joint pain and reporting hip replacement surgery at the end of the week. (Tr. 161). Dr. Inman diagnosed Claimant with benign essential hypertension, osteoarthritis involving his hand, and avascular necrosis of femoral head and cleared Claimant for surgery. (Tr. 162). Dr. Inman advised Claimant to stop smoking. (Tr. 163).

On July 6, 2007, Dr. Brent Matthews performed laparscopic bilateral hernia repairs with mesh and umbilical hernia repair at Barnes Jewish Hospital. (Tr. 413-17).

On July 31, 2007, Claimant returned to the Murphy Health Center and reported having pain and difficulty with joints. (Tr. 156, 409). Claimant reported taking medications for hypertension without difficulty. Claimant reported smoking one package of cigarettes each day. (Tr. 156, 409). Claimant rated his pain at a level five out of ten. (Tr. 157, 410). Examination showed decreased range of motion with painful movements of the bilateral shoulder, wrist and knee. (Tr. 158, 411). Dr. Inman referred Claimant to St. Louis Connect Care Orthopedics and prescribed Vicodin. (Tr. 158, 411).

On August 10, 2007, Claimant visited St. Louis Connect Care on referral by Dr. Inman and reported severe bone and joint pain. (Tr. 230, 237, 295). Claimant reported that he stopped working three years earlier because he was laid off. (Tr. 231, 296). Dr. Zarmeena Ali prescribed pain medication, Tylenol #3, as needed and directed Claimant to complete his range of motion exercises every day. (Tr. 233, 235, 258, 298). The doctor assessed Claimant with osteoarthritis. (Tr. 298). The x-ray of Claimant's right and left hands showed minimal degenerative joint disease. (Tr. 299-300).

On August 28, 2007, Claimant returned to the Murphy Health Center complaining of arthritis and rating his pain at a level five. (Tr. 151). Dr. Inman noted that Claimant's pain to be well controlled on medication. (Tr. 151). Dr. Inman prescribed Relafen and noted follow-up appointments with orthopedist and rheumatologist. (Tr. 152).

On September 18, 2007, Claimant called the Murphy Health Center requesting refill of pain medication. (Tr. 150). Dr. Inman agreed to refill his pain medication. (Tr. 150).

On October 5, 2007, Claimant returned to St. Louis Connect Care complaining of pain all over his body at the level of ten. (Tr. 288). Claimant reported Vicodin to be the only medication that has helped alleviate his pain. (Tr. 288). Dr. Ali noted he was unable to examine Claimant fully due to Claimant's complaints of pain on touching. (Tr. 289). Dr. Ali assessed Claimant to have osteoarthritis and determined Claimant to be severely deconditioned with the need to increase daily activities. Dr. Ali recommended acquatherapy [sic] and Claimant take daily calcium and vitamin D. Dr. Ali prescribed Vicodin for pain. (Tr. 289).

On December 14, 2007, Claimant returned to the Murphy Health Center complaining of hypertension. (Tr. 146). Dr. Inman noted that Claimant reported

taking medications without difficulty starting on July 31, 2007. Claimant reported feeling well with minor complaints of pain in joints and taking medications without any side effects. Claimant reported smoking one package of cigarettes a day. (Tr. 146). Examination showed a full range of motion in all joints. (Tr. 148). Dr. Inman diagnosed Claimant with hypertension and osteoarthritis and noted Claimant's arthritis to be managed by rheumatology. (Tr. 148). Claimant called on December 17, 2007 requesting updated rheumatology clinic referral, and the nurse noted that she located a referral for six visits last summer. (Tr. 145, 227).

Claimant received treatment at St. Louis Connect Care on December 14, 2007 for his joint pain and severe pain in his right wrist. (Tr. 225, 280). Claimant reported working three years later but then being laid off. (Tr. 225, 280). Dr. Ali prescribed medication and instructed Claimant to return for follow-up treatment. (Tr. 226, 281). Dr. Ali gave Claimant a 10mg depomedrol with 0.5 lidocaine injection. (Tr. 282). In a return visit on December 31, 2007, Claimant reported severe pain in his left hip and right knee. (Tr. 221). The x-rays showed moderate degenerative joint disease in the right knee. (Tr. 221, 276). Claimant reported Vicodin as helping. (Tr. 221). The x-ray of Claimant's left knee showed no significant arthritic change. (Tr. 275). The x-ray of his right knee showed moderate degenerative joint disease. (Tr. 276). The x-rays of Claimant's hips showed status post hip arthroplasty changes and the right hip to be within normal limits. (Tr. 277).

On January 17, 2008, Claimant reported pain all over his body and the prior injection not working to alleviate his pain. (Tr. 220, 269-70). Claimant reported that Vicodin provides him considerable relief. (Tr. 216). Claimant reported being able to walk daily and has been trying to get into acquatherapy [sic] class at the Florissant civic center. (Tr. 216, 270). Dr. Ali observed Claimant to have an abnormal gait and limping on the left. (Tr. 217, 272). Dr. Ali continued the Vicodin prescription and directed Claimant to exercise daily to improve tolerance and to return in one month. (Tr. 217, 219).

On February 11, 2008, Dr. Brian Fissel, a physician in the Department of Orthopedic Surgery at St. John's Mercy Medical Center, evaluated and examined Claimant for treatment of status post left total hip arthroplasty with pain and right knee pain on referral from the Connect Care Clinic. (Tr. 431-33). Claimant reported pain in the left hip for the past four years and total hip arthroplasty performed by Dr. Whiteside with no complications at the time of surgery. (Tr. 431). Claimant walks with a limp and rated his level of pain as a four. Claimant reported not using any supportive devices. Claimant reported being able to walk around the block, and sitting not causing him problems. Claimant rated his knee pain at the level of a ten. (Tr. 431). Examination showed a full range of motion of the right hip and a limited range of motion of the left hip. (Tr. 432). Examination of the right knee showed slight flexion contracture and some positive tenderness to palpation along the medial joint line and some along lateral joint line. Dr. Fissel included in his impression

failed left total arthroplasty with osteolysis surrounding the acetabular cup and severe osteoarthritis of the right knee. Dr. Fissel determined that in order to better assess Claimant's hip, he would need to obtain a CAT scan of his pelvis and proximal femur. Dr. Fissel found that Claimant would be a candidate for total knee arthroplasty on the right side, and this should be done after Claimant's left hip has been resolved. Dr. Thomas Otto indicated that he was present during the physical examination and discussed the findings of the physical examination with the resident and agreed with the impression and plan of treatment. (Tr. 432). The x-rays revealed a total hip arthoplasty on the left side with a large cavitary lesion in the superior region above the acetabulurn, some slight eccentric polyethylene wear, overall the cup to be well fixed and in good position, and femoral component to be well fixed with no obvious cavitary lesions and/or large areas of asteolysis. The x-ray of his knees revealed severe osteoarthritic changes, complete loss of joint space on the medial side with some osteoarthritic formation as well as sclerosis of both joint surfaces and osteophytes present laterally and on the patellofemoral joint. (Tr. 433).

In a follow-up visit on April 23, 2008 at the Murphy Health Center, Claimant requested a referral to rheumatology. (Tr. 139, 394). Claimant returned for an annual physical and surgical clearance for left hip replacement by Dr. Otto at St. John's. Other than severe arthritic pain, Claimant reported doing well and blood pressure being well controlled. (Tr. 139, 394). Examination showed a full range of motion of all joints. (Tr. 141 396).

On April 30, 2008, Claimant received treatment at Murphy Health Center for hypertension noted to be well controlled, tobacco use disorder, and hyperlipidemia. (Tr. 138, 393). The ARPN noted that Claimant would be referred for smoking cessation treatment. (Tr. 138, 393).

In a follow-up visit on May 9, 2008 at St. Louis Connect Care, Claimant reported pain all over his body at a level ten. (Tr. 209, 263, 265). The doctor noted that Claimant was last treated on January 17, 2008 for tendinitis and taking Vicodin for pain relief. (Tr. 210). The doctor noted that Claimant has difficulty walking due to pain and limping on the right side due to foot pain. (Tr. 211-12, 266-67). Claimant reported continued tobacco use. (Tr. 265). The doctor found Claimant to have osteoarthritis and determined to treat on current therapy with Vicodin and injections. (Tr. 212).

On May 27, 2008, Claimant returned to St. Louis Connect Care for evaluation and treatment. (Tr. 259). Claimant reported pain at a level four, chest pain, and shortness of breath. (Tr. 259-61). The doctor recommended a stress test. (Tr. 261).

On September 4, 2008, Claimant returned to Dr. Otto's office for a preoperative evaluation. (Tr. 434). The x-ray of Claimant's pelvis showed a left

11

total hip arthroplasty with obvious hardware failure, and significant evidence of osteolysis in the dome and posterior wall posterior column region of the acetabulum. (Tr. 435). In the radiographic impression, the doctor noted periacetabular osteolysis with no conclusive evidence of loose implants following a remote left total hip arthroplasty. (Tr. 435). Claimant reported taking three Vicodin each day and on most days, being able to walk his dog around the block but sometimes not being able to do so because of pain. (Tr. 457). In the impression, Dr. Otto noted how Claimant is scheduled to undergo revision left total hip arthroplasty. Dr. Otto observed Claimant to have a mildly antalgic gait favoring his left side. (Tr. 457).

On September 17, 2008, Dr. Otto performed revision arthroplasty of the left hip with bone graft. (Tr. 436-56, 459-506). Claimant's preoperative diagnosis included failed left total hip arthroplasty and the operative procedure to be revision arthroplasty of left hip, both components, with injectable bone graft substitute periacetabular. (Tr. 487). In the clinical history, Dr. Otto noted that Claimant had a total hip replacement in 1994, and he did well until several years earlier when he started to have increasing osteolsis involving the periacetabular bone in the left hemipelvis. (Tr. 487). After the surgery, Dr. Otto recommended that Claimant continue physical therapy. (Tr. 464).

## IV. The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date. (Tr. 18). Claimant last met the insured status requirements of the Social Security Act on December 31, 2009. The ALJ found that the medical evidence establishes that Claimant has osteoarthritis ,but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 18). Also, the ALJ noted that Claimant received unemployment benefits, which required him averring that he was ready and able to work and was actively seeking employment. (Tr. 21). The ALJ found that Claimant has the residual functional capacity to perform a full range of sedentary work. (Tr. 18). The ALJ determined that Claimant is able to perform past relevant work as a purchasing agent and such work does not require the performance of work-related activities precluded by his residual functional capacity. (Tr. 21). In assessing Claimant's RFC, the ALJ evaluated his credibility. (Tr. 19-21). The ALJ found that Claimant was not under a disability from January 1, 2005, the alleged onset date, through the date of his decision. (Tr. 21).

Report and Recommendation at 1-15 (Doc. 29).

**Discussion**

A.  The ALJ's Disability Determination

The ALJ determined that Claimant is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the Social Security regulations. See 20 C.F.R. § 404.1520(a)-(f); Page v. Astrue, 484 F.3d 1040, 1042 (8th Cir.2007).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir.2005) (cited case omitted); see also 20 C.F.R. § 404.1520(a)-(f).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (cited case omitted).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (cited case omitted).  If the claimant meets this burden, then the burden of proof shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. Id.  The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945.  "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and

claimant's own descriptions of his limitations.'" Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir.2005) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001)). The ALJ has the duty to investigate the facts and develop a full record and arguments both in support of and against granting disability benefits. See Sims v. Apfel, 530 U.S. 103, 111 (2000).

The ALJ applied the first step of the analysis and determined that Claimant had not engaged in substantial gainful activity since January 1, 2005. At the second step, the ALJ concluded from the medical evidence that Claimant has the following severe impairment: "osteoarthrosis (20 CFR 404.1521 *et seq*. and 416.921 *et seq*.". At the third step, the ALJ found that Claimant did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P of Regulations, Appendix 1." At the fourth step, the ALJ determined that, "In comparing the claimant's residual functional capacity with the physical and mental demands of this work [as a purchasing agent], the undersigned finds that the claimant is able to perform it as actually and generally performed. The claimant testified that his past job as a purchasing agent allowed him to sit eight hours a day. By his own admission to Dr. Otto the claimant has no difficulty sitting." See Admin. Record at 21. Accordingly, the ALJ found that Claimant was not disabled.

B. Claimant's Residual Functional Capacity

Claimant contends that the ALJ's decision is not supported by substantial evidence because the ALJ erred by failing to make a function-by-function assessment of his RFC, specifically, findings as to his capacity for each of the exertional activities associated with sedentary work--lifting and carrying, pushing and pulling, sitting, standing and walking. Claimant also argues that the ALJ

should have taken into account his need for future surgery. The Commissioner did not respond to

Claimant's objections, but in his brief states

> In this case, Plaintiff has not met his burden to prove that he cannot meet the exertional demands of work at the sedentary level of exertion. The regulations define sedentary work as that which involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Walking and standing are required only occasionally. See 20 C.F.R. § 404.1567(a); Ownbey v. Shalala, 5 F.3d 342 (8th Cir. 1993).

> Substantial evidence supports the ALJ's finding that Plaintiff could perform the full range of sedentary work. As discussed in the previous argument, Plaintiff's testimony, coupled with statements he made to physicians in the course of obtaining treatment, reasonably suggest he had minimal difficulty sitting. Within days before his left hip replacement surgery, Plaintiff told his orthopedic surgeon that he could walk around the block (Tr. 20, 431, 457). This indicates ability to stand and walk at least occasionally. It is proper for the Court to look at all of the ALJ's analysis, not just his summary or conclusion, as Plaintiff seems to suggest. See Wiese v. Astrue, 552 F.3d 728, 733-34 (8th Cir. 2009) ("Indeed, the ALJ wrote nearly four full pages of analysis regarding the consistency between Wiese's self-reports contained in the record, her treating physicians' notes and assessments, the medical evidence and the hearing testimony. In doing so, the ALJ provided a thorough analysis of the inconsistencies he noted in the record, and those inconsistencies are supported by the record.").

Commissioner's Brief at 9-10.

At step four of the five-step sequential test, "[b]efore determining whether [Claimant] was able to return to [his] past work, the ALJ was required to determine [his] RFC." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (citing 20 C.F.R. § 404.1520(e)). A claimant's RFC is the most he can do despite his physical and mental limitations. Depover v. Barnhart, 349 F.3d 563, 565 (8th Cir .2003). The RFC "'is a function-by-function assessment based upon all the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." Roberson, 481 F.3d at 1023 (quoting S.S.R. 96-8p, 1996 WL 374184 at *3 (Soc. Sec. Admin. July 2, 1996)). Relevant evidence for determining a claimant's RFC includes "'medical

records, observations of treating physicians and others, and an individual's own description of his limitations.'" Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoted case omitted). In determining whether an individual is capable of returning to his past relevant work, the ALJ must specifically set forth the individual's limitations and determine how those limitations affect his RFC. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir.2000) (cited case omitted).

The ALJ is required to make "'explicit findings' regarding the physical and mental demands of [the claimant's] past work, and to compare those demands with [his or] her residual functional capacity to determine whether [he or] she could perform the relevant duties." Id.[3] (quotation omitted); see also Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999) ("'An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity.' Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991)."). Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir. 1995) (holding that conclusory determinations an individual can perform past work without specific findings as to the physical and mental demands of his past work and how those demands affect the individual's ability to perform that work, does not constitute substantial evidence that he is able to return to his past work).

The Court finds that the ALJ did not sufficiently provide the required residual functional assessment in this case. In Pfitzner, the Eighth Circuit Court of Appeals remanded the claimant's

---

[3]An explicit description of the relevant demands of past work can be based on a "detailed description of the work obtained from the claimant, employer, or other informed source." Sells v. Shalala, 48 F.3d 1044, 1046 n.1 (8th Cir. 1995) (quoting S.S.R. No. 82-62, Soc. Sec. Rep. 809, 811-12 (West 1983)).

case back to the ALJ because the ALJ "failed to make the required specific findings as to Pfitzner's residual functional capacity and past work demands." Pfitzner, 169 F.3d at 569. Similar to Pfitzner, the Court finds that this matter should be remanded because the ALJ failed to make a function-by-function assessment of Claimant's physical limitations. In addition, the ALJ failed to make the required "'explicit findings' regarding the physical and mental demands of [Claimant's] past work, and to compare those demands with [his or] her residual functional capacity to determine whether [he or] she could perform the relevant duties." Lowe, 226 F.3d at 972 (quotation omitted).

The ALJ's RFC determination merely stated that Claimant has the RFC to perform the full range of sedentary work, without testimony from a vocational expert. Tr. 18. The ALJ did not make any specific findings regarding Claimant's limitations with lifting, carrying, pushing, pulling, sitting, standing, walking, or any other exertional requirement. Tr. 16-21. The ALJ adopted Claimant's description of his previous work as a purchasing agent as requiring Claimant to sit for eight hours and use his hands for typing all day. Tr. 19. The ALJ failed to fully develop the record with respect to the requirements of Claimant's previous work. The Court notes that Claimant's Work History Report does not contain specific information about either the purchasing agent position he held from 2000 to 2002, or the purchasing manager position he held from 2002 to 2004.[4]

_____

[4]The Commissioner argues in his Brief that the ALJ properly considered the demands of Claimant's past work as a purchasing agent for American Rail, which "did not require any lifting or carrying, he walked for one hour, stood for two to three hours, sat for three to four hours, and wrote, typed, and handled small objects four to five hours." Brief at 11. This description of Claimant's job duties is incorrect and cannot serve to support the ALJ's decision.

It is not clear where the Commission obtained his description of Claimant's job duties, as there is no citation provided in the Brief, but it is not from Claimant's testimony, and the Work History Report does not include a description of Claimant's job duties as either a purchasing agent from 2000 to 2002 or a purchasing manager from 2002 to 2004. The Court notes that the job demands as listed by the Commissioner do correspond with Claimant's Work History Report for job

The ALJ found that Claimant was able to perform his past work as a purchasing agent as it is actually and generally performed, because the job allowed him to sit eight hours a day. This finding does not resolve how different expectations existed for performance of the job at different times as Claimant's physical condition deteriorated. The ALJ's decision ignores Claimant's testimony concerning how the requirements of the purchasing agent position changed over the period of several years that Claimant held the position as he became unable to meet its requirements. Although Claimant's hearing testimony is somewhat unclear as to whether he was discussing the tool room attendant or purchasing agent position, he testified that he was initially required to sit for two hours each day, stand the rest of the day, and lift or carry 30 pounds (which was an accommodation, as the position required that he lift 50 to 70 pounds). Tr. 537-38. Claimant testified that after he could not physically perform these requirements any longer, he "slowly moved to where [he] was sitting all day," Tr. 537, and at the end, "couldn't lift anything at all." Tr. 538. The ALJ should clarify the physical and mental requirements of Claimant's past work and then compare those demands with Claimant's residual functional capacity to determine whether he could perform the relevant duties.

In addition, the ALJ's RFC finding is inconsistent with the medical consultant's finding in the Physical Residual Functional Capacity Assessment that Claimant could only sit for about six hours in an 8-hour workday. Tr. 426. It is also inconsistent with Claimant's testimony that he was unable to sit long enough to get his job done, had to leave his desk frequently, and was reprimanded for leaving his position frequently, Tr. 537, and his subjective complaints of pain as documented

_____

duties while he was employed as the general manager of a bowling center from 1985 to 1989. See Work History Report, Tr. 99-100 (Job Title No. 1).

throughout the extensive medical records. The RFC finding appears to be based largely on Claimant's statement, as recorded in Dr. Otto's note, that Claimant did not have trouble sitting. This vague and inconclusive statement does not constitute substantial evidence to support the ALJ's RFC determination, because Dr. Otto's note does not address whether Claimant could sit for a full eight hours, or any significant length of time, on a sustained basis. The note does not make clear whether it applied to sitting one time, as opposed to repetitively, or for a long period, or both. No medical evidence in the record indicates that Claimant could sit for eight hours on a sustained basis, and the Court believes the ALJ improperly drew an inference from Dr. Otto's vague and isolated statement that Claimant had no limitations with sitting. By relying on this isolated and unexplained statement, the ALJ failed in his duty to investigate the facts and develop a full record. See Sims, 530 U.S. at 111. In addition, the ALJ ignored the remainder of Dr. Otto's note, where Claimant reported progressively worse left hip pain, thigh and groin pain, inability to drive for longer periods due to carpal tunnel, and multiple knee and hip complaints, and Dr. Otto noted that Claimant walked with a limp.

On remand, the ALJ shall provide a function-by-function assessment of Claimant's physical limitations, fully and fairly develop the record and make explicit findings as to the physical demands of Claimant's previous work as a purchasing agent, and compare those demands with his RFC, and consider the entire record in determining his RFC, including his own description of her limitations. See Lacroix, 465 F.3d at 887.[5]

---

[5]With respect to Claimant's objection that the ALJ failed to consider his need for future knee surgery, the Court agrees with the Magistrate Judge that Claimant's future knee replacement surgery does not constitute substantial evidence of what Claimant was able to do at the time the ALJ rendered his decision. Claimant testified at the hearing that he was awaiting knee replacement surgery but there was no testimony that his knee condition would deteriorate after surgery or that

C.  The ALJ's Credibility Determination

Claimant argues that the ALJ failed to properly analyze his subjective allegations of pain, functional limitations, and total disability in accordance with Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  In particular, Claimant argues that the ALJ failed to consider the "type, dosage, effectiveness, and side effects of any medication" he takes to alleviate his pain and other symptoms, as required by 20 C.F.R. § 404.1529(c)(3)(iv).

The ALJ found that Claimant's "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. 20.  The ALJ's credibility finding consists of the following:

> The undersigned finds that the evidence contained in the record fails to support allegations of a severe and debilitating impairment or combination of impairments. The treatment notes indicate at best, ailments that appear troublesome, but do no impose limitations of such significance as to preclude sustained competitive employment.  The record establishes that none of the claimant's treating physicians have ever recommended that he not seek employment.  X-rays of the claimant's hands in 2007, showed only minimal degenerative changes and X-rays of the knees in 2007, showed moderate degenerative joint disease of the right knee and no abnormalities on the left.  The claimant report to Dr. Otto in 2008, that his Vicodin was helping and allowed him to sleep better and walk his dog around the block on most days.  The claimant also reported to Dr. Otto that sitting down caused him no problems.  Finally, the claimant testified that following his discharge from work in 2004, he collected unemployment.  This would have required the claimant to affirm that he was ready, willing and able to work and was actively seeking employment. In sum, the above residual functional capacity assessment is supported by the

the surgery would impair Claimant's ability to function in a work-like setting.  The Court notes that Claimant did not cite any legal authority to the Magistrate Judge or in his objections to the Report and Recommendation that the ALJ must consider future surgery in determining a claimant's RFC.

treatment notes of the claimant's physician's [sic], the claimant's own testimony, and th record as a whole.

Tr. 20-21.

In evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard the complaints "solely because the objective medical evidence does not fully support them." Polaski, 739 F.2d at 1322. The absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider, however. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted)

> The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions.

Polaski, 739 F.2d at 1322. A claimant's subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir.2006) (citing Polaski, 739 F.2d at 1322). The ALJ must give reasons for discrediting the claimant. Id. (cited case omitted). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, a court will not disturb the ALJ's credibility determination. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (cited case omitted); see also Guilliams, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). The ALJ is not required to discuss "methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints." Lowe, 226 F.3d at 972.

In his decision, the ALJ did not mention Polaski, but he did make an explicit credibility determination, and in another portion of the decision referenced S.S.R. 96-7p, which incorporates some of the Polaski factors.[6]  The ALJ's credibility analysis is insufficient because he failed to adequately consider the Polaski factors, failed to develop the factual record fully and fairly, and relied in large part on the objective medical evidence to suggest that Claimant is not credible.  See Polaski, 739 F.2d at 1322 (an ALJ may not disregard the subjective complaints of a claimant "solely because the objective medical evidence does not fully support them.");

As set forth above, Claimant complains of joint pain, recurrent pain from left hip necrosis, and severe right knee osteoarthritis pain.  He has undergone three right knee surgeries, two hip

---

[6]Under S.S.R. 96-7p, when making a credibility determination, an ALJ must: consider in addition to objective medical evidence ...:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain and other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms ...; and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

See S.S.R. 96-7p, 1996 WL 374186 at *3 (Soc. Sec. Admin., July 2, 1996).

surgeries in the 1980s, a total hip replacement in 1992, and a total revision of the left hip replacement in September 2008. This surgical history, and plaintiff's consistent treatment with multiple pain medications over a period of years, is evidence to support Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms.

The record shows that Claimant has a long and significant work history, having been steadily employed from 1985 to 2004, a Polaski factor that the ALJ did not consider. On remand, the ALJ must consider Claimant's work history.

In reaching the credibility determination to negate the finding that Claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms, the ALJ relied on the following: (1) On most days, Claimant could walk his dog around the block, (2) Claimant stated on one occasion that sitting caused him no problems; (3) Claimant was able to drive because he drove three times per week to an Alcoholics Anonymous meeting; (4) x-rays did not support the claimed severity of Claimant's symptoms; and (5) Claimant collected unemployment after he was asked to leave his job. Tr. 20-21. The Court believes that the ALJ's credibility determination does not appear to be supported by good reasons and substantial evidence.

Although the medical record indicates Claimant told Dr. Otto he could walk his dog around the block on most days, the same record also reflects that Claimant sometimes could not do this because of pain, and that he was taking three Vicodin tablets each day. At the same visit where the dog walking was noted, Claimant reported progressively worse left hip pain, thigh and groin pain, inability to drive for longer periods due to carpal tunnel, and multiple knee and hip complaints. Dr. Otto noted that Claimant walks with a limp. The ALJ failed to reconcile his reliance on the statement concerning Claimant's dog walking with Claimant's testimony that his daily activities

23

largely consist of spending most of his time in a recliner and leaving the house only once a day, and his testimony that he is unable to sit for more than an hour and stand for only five minutes at a time.

The ALJ failed to consider dosage, effectiveness and side effects of medication that Claimant takes, as required by Polaski. In particular, the ALJ should determine whether Claimant suffers any side effects from his extensive use of pain medication, such as drowsiness, or impairment of his thinking or reactions, that could affect his credibility as well as his mental or physical ability to perform his past work.

The ALJ concluded that Claimant's claims are not credible because he has no difficulty sitting, based on the admission, as recorded in Dr. Otto's note of February 11, 2008, that "sitting does not cause him problems." In reaching this conclusion, the ALJ ignored the remainder of Dr. Otto's note, as discussed above, where Claimant reported progressively worse left hip pain, thigh and groin pain, inability to drive for longer periods due to carpal tunnel, and multiple knee and hip complaints, and Dr. Otto noted that Claimant walked with a limp. As previously stated, Dr. Otto's note does not address whether Claimant could sit for a full eight hours, or any significant length of time, or a sustained basis. The note does not make clear whether it applied to sitting one time, as opposed to repetitively, or for a long period, or both. No medical evidence in the record indicates that Claimant could sit for eight hours on a sustained basis, and the Court believes the ALJ improperly drew an inference from Dr. Otto's vague and isolated statement that Claimant had no limitations with sitting.

The ALJ appears to have concluded that Claimant has an unlimited ability to drive based on his ability to drive to AA meetings three times per week, but the record appears to indicate that Claimant testified this was the only driving he does, and there is no indication in the ALJ's decision

as to how far Claimant drove to these meetings or whether the driving caused him pain. As noted above, Claimant complained to Dr. Otto about longer driving causing him pain. Further, the ALJ did not discuss how Claimant's ability to drive affects his ability to perform his past work. On remand, the ALJ should further develop the factual record with respect to Claimant's ability to drive.

The ALJ noted that x-rays of Claimant's hands showed only minimal degenerative changes, but his decision does not discuss the value of x-rays with respect to Claimant's claims of wrist pain and carpal tunnel syndrome as document in the medical records. The ALJ noted that x-rays of Claimant's right knee on December 31, 2007, revealed only moderate degenerative joint disease, but the decision did not discuss that less than two months later, on February 11, 2008, Dr. Otto ordered x-rays of Claimant's knee and interpreted them as showing severe osteoarthritic changes, complete loss of joint space on the medial side with some osteophyte formation, and sclerosis of both joint surfaces. Dr. Otto diagnosed severe osteoarthritis of the right knee, and advised Claimant he will need a total knee arthoplasty.

Finally, the ALJ states that Claimant's credibility is negatively affected because he collected unemployment after his discharge from employment in 2004, and therefore he had to affirm that he was ready, willing and able to work. The decision does not state how long Claimant received these benefits, or cite evidence that Claimant realized his application for unemployment benefits constituted an admission that he was capable of working. The ALJ's negative credibility finding appears to be automatic. The Eighth Circuit Court of Appeals has held, however, that the simultaneous search for work and application for Social Security disability benefits alone cannot support a finding of lack of credibility, see Spencer v. Bowen, 798 F.2d 275, 278 (8th Cir. 1986), and that the negative impact of simultaneously seeking unemployment and disability benefits

"cannot be uniformly or automatically applied in every case," <u>Cox v. Apfel</u>, 160 F.3d 1203, 1208 (8th Cir. 1998). On remand, the ALJ on remand should develop the facts with respect to Claimant's receipt of unemployment benefits and then explain why it affects his credibility.

On remand, the ALJ shall consider Claimant's credibility in accordance with <u>Polaski</u>, consider all the <u>Polaski</u> factors, and provide clear reasons for his credibility determination. <u>See</u> <u>Lowe</u>, 226 F.3d at 972 (an ALJ must acknowledge and examine the <u>Polaski</u> considerations before discounting the subjective complaints of a claimant).

**Conclusion**

The Court concludes this matter should be remanded to the Commissioner for further proceedings in accordance with this Memorandum and Order. On remand, the ALJ should provide a function-by-function assessment of Claimant's physical and mental limitations, make explicit findings as to the physical demands of Claimant's previous work and compare those demands with his RFC, and consider the entire record in determining his RFC, including his own description of his limitations. The ALJ should also properly apply the <u>Polaski</u> factors when determining Claimant's credibility with regard to his subjective complaints of pain, functional limitations, and total disability.

Accordingly,

**IT IS HEREBY ORDERED** that the Report and Recommendation of the United States Magistrate Judge is **sustained, adopted** and **incorporated** to the extent of its recitation of the procedural history of this matter as set forth herein. [Doc. 29]

**IT IS FURTHER ORDERED** that the decision of the Commissioner denying Claimant's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income ("SSI") benefits under Title XVI of the Act is **REVERSED**.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to the Commission for further proceedings consistent with this Memorandum and Order pursuant to sentence four of § 405(g).

An appropriate judgment will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  29th  day of March, 2011.